JOHANNA LUEDERS v. ST. LOUIS AND SAN FRANCISCO RAILROAD COMPANY, Appellant.

Division One, December 6, 1913.

1. CONSTITUTIONAL LAW: Sec. 5425, R. S. 1909: Damages for Negligent Killing. Sec. 5425, R. S. 1909, providing for damages in certain cases when death results from injuries caused by operators of public conveyances, is constitutional.

2. RIGHTS OF PUBLIC UPON RAILROAD TRACK LAID IN CITY STREETS. One who goes upon a railroad track laid in a public street of a city is not a trespasser, nor does he depend for his right upon the railroad's permission.

3. ————: Use of Track by the People and the Road: Negligence. A railroad that operates upon tracks in the public streets of a city must have due regard to the safety of those walking on the track, and the pedestrian must not unnecessarily expose himself to danger from the lawful use of the railroad's engines and cars, nor unnecessarily embarrass the railroad in the performance of its duties to the public.

4. ————: ————: ————: Regulating Speed by Ordinance: Presumptions that May be Indulged by Pedestrian and by the Road. A city ordinance limiting to five miles per hour the speed of trains moving on tracks laid in the city streets is reasonable and valid, and while the railroad still has the right in the lawful use of its franchise to assume that its warning signals will be obeyed, yet a pedestrian has the right to assume that trains will not exceed five miles per hour while running in said streets.

253 Mo. 7

5. **COURTS: Assumptions of Fact: "Telegraph Poles:" Distance.** Courts may assume that a "telegraph pole," in railroad nomenclature, ordinarily represents a distance of as much as one hundred and fifty feet. [GRAVES and LAMM, JJ., dissenting.]

6. **NEGLIGENCE: Exceeding Speed Limit.** Plaintiff seeks damages for the killing of her husband and alleges that his death resulted from defendant's negligence in running its train in a city street in excess of the speed limit set by ordinance at five miles an hour. The answer was a general denial and a plea of contributory negligence in going upon defendant's tracks and in failing to step off when he saw the train and was warned of its approach. Plaintiff's husband was killed by defendant's train while he was walking upon a track laid in Aquamsi street in Cape Girardeau. The track ran north down Aquamsi street across Good Hope street, then across William street, 520 feet from Good Hope, and then on to the north. The deceased, old and feeble, went upon the track 150 feet south of William street and walked north until he reached a point 180 feet north of William street, where he was struck. William street is 70 feet wide, so the deceased had moved altogether about 400 feet. Defendant's engineer, running as he said at a speed of eight or ten miles an hour, or perhaps less, shut off steam at Good Hope street, preparatory to drifting down the one per cent grade to the north. He saw, as he says, no one on the track ahead as he crossed Good Hope and he whistled four times to call attention to his signals. Then he gave his attention to his engine for two or three seconds and when he looked up he says he saw the deceased about seventy feet ahead of him on the track, whereupon he put on the emergency brakes and blew the whistle. Meantime the deceased, having been warned, stepped almost off the track, but was struck and killed by the bumper beam of the engine. *Held*, that upon all the evidence the jury were warranted in finding for plaintiff on the ground that defendant's train was exceeding the speed limit set by ordinance and that such excessive speed contributed directly to cause her husband's death.

7. **————: ————: Presumptions: Contributory Negligence.** A pedestrian has the right to presume, when he goes upon a railroad track laid in a city street, that the railroad will conform the speed of its trains to the requirement of city ordinances—in this case five miles an hour, and this presumption will continue until he shall become aware or have reason to believe that the railroad is violating or will violate the ordinance. After he has seen an approaching train it

Lueders v. Railroad.

is his duty to give it the right of way by making all reasonable efforts to get off the track. If the jury find that deceased could not have escaped by reasonable effort then it becomes their duty to inquire whether the train was exceeding the speed limit. If they find that it was, it remains for them to determine whether, if it had been observing the speed limit from the time he first saw it, deceased could and would have escaped.

8. ————: ————: Duty of One in Danger Who Attempts to Save Himself: Instructions. In an action for damages for the negligent killing of plaintiff's husband by defendant's employees in charge of a train, the question is not what the deceased *could* have done to save himself in the light of all the facts and circumstances developed at the trial, but whether he acted as a reasonably careful man would have done in trying to escape, and therefore an instruction was rightly refused which told the jury they should find for defendant if they found that he took the wrong side of the track when attempting to leave it and could have escaped by taking the other side.

Appeal from Cape Girardeau Court of Common Pleas.—*Hon. R. G. Raney*, Judge.

AFFIRMED.

*Moses Whybark, W. F. Evans* and *A. P. Stewart* for appellant.

(1) (a) Sec. 5425, R. S. 1909, violates Sec. 28, Art. 2, of the Constitution of Missouri, in that it deprives the defendant in a civil action of the right of trial by jury as heretofore enjoyed. Bartling v. Jamison, 44 Mo. 141. (b) Said section further violates Sec. 30, Art. 2 of the Constitution in that it deprives this defendant of property without due process of law. (c) Said section further violates Sec. 10 of Art. 2 of the Constitution, in that it prohibits the court from setting aside the verdict of the jury because the amount of damages assessed is not supported by the evidence, or because the damages awarded are excessive. Bart-

ling v. Jamison, 44 Mo. 141. (2) Running the train in excess of the speed fixed by ordinance was not the proximate cause of the injury. Moore v. Railroad, 176 Mo. 528; Schmidt v. Railroad, 191 Mo. 215; Laun v. Railroad, 216 Mo. 563; Pope v. Railroad, 146 S. W. 790. (3) Even though the train was running in excess of the speed fixed by ordinance at the place of the accident, still the negligence of the deceased was such as directly contributed to his injury, and there can be no recovery for his death. Green v. Railroad, 192 Mo. 139; Moody v. Railroad, 68 Mo. 470; Schmidt v. Railroad, 191 Mo. 215; Yancey v. Railroad, 93 Mo. 433; Laun v. Railroad, 216 Mo. 578; Sims v. Railroad, 116 Mo. App. 579. (4) It requires more than a showing of the mere possibility that the accident might have been avoided in order to bring a case within the humanitarian doctrine. Markowitz v. Railroad, 186 Mo. 359. (5) It is the settled law of this State that it is such gross negligence as precludes a recovery for a person to step on a railroad track directly in front of an approaching train, or so close as to render it impossible to stop the train in time to avoid injury. And this is true even if the train is running at a rate of speed in excess of the maximum rate permitted by law. Peterson v. Railroad, 156 Mo. 560; Moore v. Railroad, 176 Mo. 544; Ries v. Railroad, 179 Mo. 7; Mockowik v. Railroad, 196 Mo. 550; Laun v. Railroad, 216 Mo. 563. (6) Defendant's demurrer to the evidence should have been sustained. Authorities under Point 5. (7) The court erred in refusing instruction numbered 6, asked by defendant. Authorities under Point 3.

*Orren Wilson* and *Wilson Cramer* for respondent.

(1) The grant of the privilege to operate a railroad on Aquamsi street did not exclude the public from the use of the street. Plaintiff's husband was there-

fore not a trespasser, but had the right to go upon any
part of the street, including that occupied by defend-
ant's track. Riska v. Railroad, 180 Mo. 190. (2) The
passage of a speed ordinance for trains is a recogni-
tion of this right, its purpose being to protect the pub-
lic in its concurrent use of the street. (3) Plaintiff's
husband had the right to assume while walking on the
track in Aquamsi street that the defendant company
would not run its trains at a greater rate of speed than
that prescribed by ordinance. Weller v. Railroad, 164
Mo. 199; Riska v. Railroad, 180 Mo. 190; Eckhard v.
Transit Co., 190 Mo. 613. (4) The law presumes that
he was exercising due care in going upon the track.
Weller v. Railroad, 164 Mo. 198; Riska v. Railroad, 180
Mo. 188. (5) Operating a railroad train in a public
street at a rate in excess of that prescribed by ordi-
nance is negligence *per se*. This is so well settled in
this State that we refrain from citing authorities. (6)
Contributory negligence is an affirmative defense, so
pleaded in this case, and the burden rested upon the de-
fendant to overcome the presumption of due care on
the part of the deceased. Defendant utterly failed to
rebut this presumption. There is nothing in the record
bearing on this point. In Eckhard v. Transit Co., 190
Mo. 613, this court says: " 'And in order to overcome
the presumption and to defeat plaintiff's action, it de-
volved upon defendant to show, by the weight of the
evidence, a failure on the part of deceased to exercise
ordinary care to avoid the injury, and that his failure
to exercise such care was its proximate cause, and so
direct and immediate that, but for the want of such
ordinary care, the injury would not have occurred.' In
Buesching v. Gaslight Co., 73 Mo. 219, it was said:
'The presumption of due care always obtains in favor
of plaintiff in an action to recover damages for an in-
jury sustained by him through the alleged negligence
of another.' The rules of law announced in the cases

above cited were fully reviewed by this court as well as the St. Louis Court of Appeals in the recent cases of Riska v. Railroad, 180 Mo. 168, and Deitring v. Railroad, 109 Mo. App. 524, and unqualifiedly approved.''
(7)    Plaintiff's husband, after being warned of the approach of the train, had reached the ends of the ties and was just in the act of taking another step when he was struck. The slightest movement forward would have taken him beyond the end of the bumper beam. No unprejudiced mind can reach any other conclusion than that the speed of the train was the cause of the accident.

BROWN, C.—This suit was brought in the Cape Girardeau Court of Common Pleas August 23, 1907.

Negligence.    The plaintiff, respondent here, is the widow of Henry Lueders who was killed by a train of the defendant in the city of Cape Girardeau, May 1, 1907. She sues to recover, on account of his death, $10,000, the maximum penalty prescribed by section 2864 of the Revised Statutes of Missouri, 1899, as amended by the Act of April 13, 1905, being section 5425 of the Revised Statutes of 1909. The negligence charged is the violation of an ordinance of the city limiting the speed of railway engines, cars and trains within the city to five miles per hour and prescribing a fine for its violation.

Defendant demurred to the petition on the ground that the statute is unconstitutional because it vests in the jury an absolute and arbitrary discretion as to the amount of the recovery, depriving the court of the power to control it, thereby denying to the defendant the right of trial by jury as theretofore enjoyed, and depriving it of property without due process of law; and also that it closes the court against, and denies certain remedy to, the defendant for injury to his property. The demurrer was overruled and the point was

again made from time to time in the progress of the trial. The question of constitutional construction so presented is the foundation of the jurisdiction of this court.

The defendant answered with a general denial and a plea of contributory negligence by going upon defendant's tracks, and by failing to step off the track when he saw the train and was warned of its approach.

The accident occurred on Aquamsi street, a travelled street in the city of Cape Girardeau upon which defendant's track had been laid and operated for many years along the west bank of the Mississippi River. The defendant's shops and roundhouse and the trackage connected therewith were situated on a tract of land adjoining the river in the southern part of the city through which its main track extended, from the southern limits, more than three quarters of a mile south of William street, reaching the river bank where Morgan Oak street abutted on a levee; thence north to Good Hope street, a distance of one block of about 450 feet; thence across Good Hope street to William street, about five hundred and twenty feet further; thence north along the levee in Aquamsi street some six hundred and thirty-five feet further, and thence in the same general direction to defendant's passenger station and through the city. The freight depot was a considerable structure situated on the east side of the track toward the river between Good Hope and William streets, and between the main track and the depot, extending from Morgan Oak street to a point between the south side of William street and the north end of the depot, was a sidetrack used for loading and unloading cars. The grade of the main track from Morgan Oak to Good Hope street was nearly level; and from Good Hope street north to and beyond the place of the accident descended one per cent, or one vertical foot in each one hundred horizontal feet. At the time of the

accident a train stood on the sidetrack west of the depot consisting of a couple of freight cars, a caboose and the engine, which was headed south so that the cars cleared the switch of William street. The foot travel along Aquamsi is indicated to some extent by the testimony of the engineer who said that at the time he saw Mr. Lueders on the track there were several other people walking along a little beaten path by the west end of the ties. Mr. Carleton, a witness of the accident, said that he would pass up and down the track sometimes a dozen times a day, and Mr. McKee, another witness said he walked up and down the track every morning.

Mr. Carleton was a transfer man, and testified that he was at the freight depot on business the day of the accident, and first saw Mr. Lueders at a little road that crosses from Aquamsi street into the freight house about two thirds of the way north from Good Hope street to William street, walking north; that witness came out from the north end of the freight house and Mr. Lueders was walking on the track north of it, and witness passed him. He seemed to have a cane or fish pole, he could not say which. The witness thought a man as feeble as he looked to be was in danger and had no business there. He was old and feeble and seemed to be nervous and that is how he came to notice him so much. The witness was on the north side of William street when he first heard the train, it was then south of Good Hope street and had not yet whistled for the crossing. He walked on something like ten steps and turned around and saw the old man still walking, and about that time the train came around the curve and blew for the crossing—four whistles. The old man was then down almost to William street. He did not look back when they blew for the crossing and the witness thought perhaps he might be deaf, and started back and motioned to him. He thinks he saw him and

finally looked back—looked directly south toward the train, which was in full view. He then turned around facing north and walked diagonally toward the edge, put one foot outside the rail on the tie, and stopped and looked back again over his shoulder in the direction of the train. The train was not very far from him at that time, probably (witness indicating) ''from here to that door.'' He made no effort to get any further, and remained standing practically in the same position until it struck him. The train whistled the alarm probably two telegraph poles from him and continued to whistle short blasts right up to the time they struck him, and applied the air something in the neighborhood of one telegraph pole from him.

Mr. Fish, the engineer, testified that he was running north into Cape Girardeau with an engine and caboose on the schedule and as first section of a passenger train, with signals displayed indicating that a second section was following. Eighty rods south of Good Hope he whistled for that crossing, and when he approached it he saw the train standing at the depot and called attention to his own signals with two blasts of his whistle. The engineer of the standing train, the engine of which was heading south, did not respond and on crossing the street he blew the same signal again making four blasts all together. The other engineer then appeared from the left side of his engine, came around the pilot and gave the necessary signal with his hands—two movements as if he were pulling the cord—and Mr. Fish passed on. He had shut off the steam before signaling the standing train, so as to drift down the hill, which gave him better control of his engine in case it should become necessary to make an emergency stop. The top of the grade was at Good Hope street. Before shutting off the steam he had glanced ahead and seen nobody on the track. After shutting it off his attention was drawn to the front of the engine to look at

the air and water gauges. It was necessary to look at the water gauge because the water sometimes recedes when the engine stops working the steam from the boiler, and he looked at the air gauge to make such that he would have the necessary pressure in case of emergency. His attention, he said, was properly drawn to the front of the engine for those purposes two or three seconds during which he would say that his engine had moved a couple of car lengths possibly. The length of the average car is thirty-four feet inside and about thirty-seven feet outside, which includes the couplings. He then looked up and saw Mr. Lueders walking about two car lengths—somewhere near seventy feet ahead of him. He then applied the air in emergency and grabbed the signal and whistled the warning. To put his hand on the brake valve and apply the air would probably consume two seconds and to reach the whistle rope about a second or so. It would consume from about two to four seconds and the train would move in that time four or five car lengths. He sounded the whistle immediately. Mr. Lueders heard it. It was the first intimation he had, apparently, that the train was there. He hesitated, looked back over his shoulder and started over the rail on the right hand side. He got both feet over the rail. He got his feet to the end of the ties but in a stooped position. His body stuck back and he was feeling with a cane as though for a place to set a foot when the bumper beam of the pilot struck him. This is a heavy beam across the front of the engine flush with the outside of the cylinders or perhaps an inch outside them to protect them. The end of this struck him in the region of the hip, he stood stooped over like this (illustrating); with the cane like this (illustrating); the bumper beam struck him right in here (indicating), and turned him around and knocked him in the direction and he fell into a pile of rocks down on this side of the dump. The engine was drifting under control. Had the man shown

up in the middle of the track when he shut off he could
have stopped easy enough but after he looked at the
gauge and looked out and saw him he could not. The
engine stopped two or three car lengths, not to exceed
three car lengths, after striking the man. The engineer
testified that south of Good Hope street he had been
running at ei ht or ten miles an hour but in coming
around the curve it slowed up to some extent when he
crossed the street. As to the speed when he struck Mr.
Lueders the following question was asked and answer
given.

"Q. At what rate of speed were you going when
you struck him? A. I stated at one time I was making
eight or ten miles, but since I have looked over the
ground and seen the distance in which I stopped and
seen the gentleman and stopped after I struck him, I
don't think I was running that fast, but I did state
at the coroner's inquest I was going that fast, because
when anything like that happens a man will naturally
judge his speed faster than any ordinary time."

Mr. McKee testified that he was living on Aquamsi
street and had for six years before the trial, about
thirty feet from the street, behind the Catholic Church
and pretty near the center of the block between Wil-
liam and Merriwether streets. He was at home the
afternoon of the accident and saw them bring Mr.
Lueders up the bank and put him in the caboose. The
point from which they brought him was across the
track and perhaps four feet further north than the
northeast corner of the witness's house.

I. The appellant calls attention to the fact that
since acquiring jurisdiction of this appeal we have
upheld the constitutionality of the sec-
tion of the statute upon which the suit
is founded in Young v. Railroad, 227 Mo.
307 (decided March 31, 1910), and Boyd
v. Railroad, 236 Mo. 54 (decided July 1, 1913), and re-
minds us that we have also held that having obtained

Sec. 5425,
R. S. 1909,
Constitutional.

jurisdiction upon the constitutional question we will retain it; citing Pope v. Railroad, 242 Mo. 232, which was decided in April, 1912. It still insists, however, upon the question. We know of no better way to meet this contention than by quoting from the last named case the following: "Since the trial of this case the constitutionality of section 5425, Revised Statutes 1909, on which the action was based, has been sustained by this court, and therefore appellant's attack thereon need not be further considered." We are still of the same mind.

II. Did the court err in refusing to direct a verdict for defendant? If there was substantial evidence tending to prove that the plaintiff, while in the exercise of that reasonable care which the law requires of persons acting under like circumstances and conditions, was struck by defendant's train because it was being run in Aquamsi street in the city of Cape Girardeau at a speed exceeding five miles per hour, then there was no error in that respect; for the killing and the existence of the ordinance limiting the speed of trains to five miles per hour are admitted for all the purposes of this hearing, and no excuse is offered for the violation of the ordinance, if it were violated, which is denied. It is seldom we have a case more free from difficulty as to the physical facts, for the stories of the three witnesses, each from his own standpoint, of which we have made the foregoing consecutive synopsis, naturally give us a clearer and more vivid impression of the details than we could have gained with our own senses from any single point of view. To qualify ourselves for the proper application of these facts, however, it will be helpful to first consider the legal situation of the parties at the time of their occurrence. Mr. Operating Railroad in Street: Rights of Pedestrian on Track. Lueders was not there as a trespasser, nor did he have to depend for his right upon the permission of the defendant. The locality was a public street of the city, dedicated to

the purposes of public travel by the public at large, on foot and on horseback as well as by the more complicated and cumbersome means of locomotion. The use by the defendant was an extraordinary one in that its vehicles were confined to an immovable track, so that they could not turn out to avoid obstacles, and were so heavy that their momentum could not be readily overcome when moving even at normal speed. For these reasons the Legislature very naturally forbade the laying of railroad tracks in the. public streets of cities without municipal permission. The easement so granted has been described by this court as "carved out of the people's common inheritance, to-wit, the right to safely come and go on a public thoroughfare." [Riggs v. Railroad, 216 Mo. 304, 317.] In the same case the court continued: "Showing the pre-existing, dominant idea of public use, it has been held that a city council has no authority to establish a street for the use of a business corporation or an individual, but that the right to establish a street is traced back to the need of the public at large. [In re Twenty-first Street (Kansas City v. Hyde), 196 Mo. 498; see, also, Scullin v. Railroad, 184 Mo. l. c. 704. et seq., and cases cited.]"

When the city of Cape Girardeau authorized the defendant to lay its track in the city and upon Aquamsi street it placed it upon an equality with plaintiff so far as the use of the street was concerned. Each had the right to use it, having due regard to the rights of the other and the nature of the use which was to be made of it by each. Public safety and the public interest demanded that the defendant should have due regard to the safety of those who should use it in a more primitive and less deadly way, and demanded of the plaintiff that he should not unnecessarily expose himself to danger from the lawful use of the defendant's engines and cars, nor unnecessarily embarrass the defendant in the performance of the duties to the

public on which its right was founded. As the city might have imposed any regulation of this character as a condition of its grant (Railway v. Kirkwood, 159 Mo. 239), so it might afterwards, and did by the speed ordinance in question, make reasonable regulations for such mutual use. And all such regulations, whether they result from the salutary principles of the common law, which come to the rescue in case of so many deficiencies in human foresight, or from direct legislative or municipal action as in this case, are mutually binding upon all parties to the transaction. As the defendant had the right in the lawful use of its franchise to assume, in the absence of any appearance to the contrary, that its signals to insure the safety of the public would be heard and obeyed, so the plaintiff had the right, in the lawful use of the street, to assume that all those things which the law required for his protection would be faithfully observed. It would be a travesty to require that the defendant move its trains at a speed of five miles per hour through the city for the protection of the public using its streets, and refuse the people any advantage from such protection, but compel them to act as if no such protection existed; to be in a constant state of *qui vive* expecting the law to be violated.

*Presumptions Warranted.*

From this standpoint we have to approach the killing of Lueders. He came on the track at a private way leading across it into the station one-third of the block or one hundred and fifty feet south of the south line of William street and near the rear of the little train that stood there with its rear car clearing the switch. Mr. Carleton, who was in the depot and saw him come on the track, left the building from the north end and got on the track behind him after he had passed the switch on his way north to the place of the accident. Lueders being old and feeble and very nervous, Mr. Carleton overtook and passed him and went on north of William street, when he heard the

*Analysis of Facts.*

train coming up from the south.  Feeling anxious for
the old man on account of his evident infirmities he.
turned round, saw him still coming down the track and
then the train came round the curve and blew for the
crossing—four whistles.  The old man did not look
back; and Mr. Carleton started back, motioning to him.
The old man then looked around and started to the
east side of the track, where he was hit.  The train
whistled the alarm about two telegraph poles from Mr.
Lueders and put on the air about one telegraph pole
away from him.  Since railways measure the distance
from mile to mile by the number of telegraph poles,
directing public attention to the system and its result-
ing information by painting upon the poles, and a
nomenclature has come into general use in which "tele-
graph poles" and "car lengths" are used as units of
distance, the courts may assume, without subjecting
themselves to the imputation of arrogance, that a tele-
graph pole ordinarily represents a distance of as much
as one hundred and fifty feet; so that, interpreting the
statement of Mr. Carleton into the latter terms, it is
safe to say that it means that the engineer whistled to
alarm Mr. Lueders when he was yet three hundred feet
away, and that he put the air on his brakes in
emergency a hundred and fifty feet away.

Keeping these things in mind, we will look for a
moment from the point of view of the engineer on the
locomotive.  He moved at least a half mile through the
town at a speed of from eight to ten miles per hour,
whistled four blasts for the crossing at Good Hope
street while yet a quarter of a mile away, and as he was
approaching it he shut off the steam, and looking ahead
saw nobody on the track, but did see a train standing
at the freight house in the block north of Good Hope.
He whistled twice to call attention to his signals and
after waiting for a response and not receiving one he
repeated his signal and it was answered.  Up to this
time he had not been hurried.  If moving only ten miles

per hour between Morgan Oak and Good Hope streets it took him a full half minute to reach the south line of the latter, and from there it would take him still longer, thirty-five seconds, to reach the south line of William street, although here he was drifting down a stiff grade without steam or brakes and would naturally pick up speed. At a point not more than one hundred and fifty feet north of Good Hope street the front of the two engines met. The communication between the two engineers was necessarily finished and we will leave him there for a few moments while we locate Mr. Lueders and then we will go back and pick him up. Mr. McKee's house, so the defendant's map shows us, was in the middle of a thirty-foot lot fronting on Aquamsi street immediately north of and adjoining the lot of the St. Vincent church one hundred and sixty-five feet wide on the north west corner of William and Aquamsi. Mr. McKee saw the injured man brought up the bank and located the point as being a few feet north of the north line of his house. All previous observations described by the witnesses had been taken while conditions were changing with lightning-like rapidity, but here the victim had become still, the place where he fell was marked by a pile of stones described by the engineer, and the defendant has perpetuated it by a mark upon the map in its abstract, so that we are at perfect liberty to take it as a starting point. The old gentleman was struck, then, at least one hundred and eighty odd feet north of William street, which is seventy feet wide and one hundred and fifty feet north of the wagon way where he entered upon the track. All these points are easily ascertained and plainly described in the evidence, and show that he had, at the time he was struck, walked along the track in his feeble way about four hundred feet. South of where he went onto it, stood the other train consisting of its three cars and engine, which according to the figures given in the testimony of Mr. Fish occupied a hundred

and fifty-three feet more.  Here we get back to his own engine running at the rate of ten miles per hour, or fifteen feet per second, with five hundred and fifty feet to go before overtaking Mr. Lueders.  This would take him, at the rate given, nearly thirty-seven seconds, and it is for this time and distance that he tries to account in his testimony.  He had a perfectly straight track before him, with the old gentleman in plain view, several hundred feet ahead of him.  We will assume that up to that time he had neglected to look at his gauges.  His attention, he said, was probably drawn to the front of the engine two or three seconds during which he would say that it possibly moved a couple of car lengths. Ignoring the fact that this movement would indicate a speed of at least seventeen miles per hour, we accept it as it is given us, and find that when his attention was released, and he found himself at perfect liberty to take up his lookout along the track he still had four hundred and seventy-five feet of track between him and the place of the accident.  He then looked up and saw Mr. Lueders on the track seventy feet ahead.  What had become of the remaining four hundred feet of track he does not say, unless there is some hint of it in the statement that when he saw the old gentleman he applied the air in emergency, and grabbed his signal and whistled a warning.  That to put his hand on the brake valve and apply the air would probably consume two seconds, and to reach the whistle rope about a second or so.  It would consume from two to four seconds, he says, and the train would move in that time four or five car lengths.  These figures would require a speed, in round numbers, of from twenty-five to sixty miles per hour.  There is no reason why the jury should not, and many reasons why they should, have believed the statement of Mr. Carleton that the engineer of the defendant's train saw the deceased, and whistled the alarm while still three hundred feet away from him, and that

253 Mo. 8

he failed to apply the air or attempt to get his train under control until too late to save him. The engineer's testimony is a story of reckless disregard of human safety in running upon a public street under the circumstances which he details, without even sufficient outlook to discover a man walking on a straight track ahead until he gets within seventy feet of him, although in plain sight of him for at least a minute and a half. This, however, constitutes no ground for recovery, as the plaintiff, in her petition has put herself fairly upon the ground that the cause of the death of her husband was the running of the train at a speed in excess of five miles per hour contrary to the provisions of the city ordinance.

III. That the evidence tended to prove that the train was running, at the time it struck Mr. Lueders, more than five miles per hour is not disputed by the appellant, and, in our opinion, it tends strongly to show that it was running at even greater speed than ten miles per hour, the maximum mentioned by Mr. Fish. It says, however, that "the facts show that the failure to observe the ordinance of five miles per hour was not the proximate cause of the injury." Upon that question there is ample evidence tending to show (1) that if the train had been running at the rate of five miles per hour Mr. Lueders would have had ample time to and would have saved himself by clearing the train with his body in the effort he actually made to escape. Had the jury believed from the whole evidence, as they might well have believed, that the train was running at the rate of ten miles per hour, the old gentleman would have had as much time in which to take the last step for which he was feeling with his cane, as it had already taken him, after his warning, to escape to that point. Had the warning been received while the engine was only seventy feet away he would still have had five seconds in which to take this step. The jury had the right to come to the sensible conclusion that

he would have taken it, and had time to spare before the engine would pass him.   (2)   They might have found from the evidence that the engineer saw the old man and recognized his danger while he was still three hundred feet (two telegraph poles) away, and that excessive speed was the only thing in the evidence tending to account, on any reasonable hypothesis, for the failure to put the train under complete control, and stop, if necessary to save him.  Or (3) they might well have adopted the engineer's own theory eloquently expressed from the witness chair, that had it not been necessary to examine the water and air gauges to guard against the explosion of his boiler, and to prepare for just such emergencies as the one he encountered a moment afterward entirely unprepared, he would have had ample time to have looked out for Mr. Lueders, and to have saved him.  Although this may seem ridiculous as an excuse in its application to the occurrences on Mr. Fish's engine from the time it passed the engine in front of the freight house to the place of the accident, yet it contains the pith that gives life to all such regulations, enabling all parties to enjoy their rights without interfering with their opportunity for forming that calm and deliberate judgment indicated by the nature of the situation, and acting accordingly.  If the jury should believe every word of his testimony it would not be difficult for them to find from it that it was the speed of his train which made it impossible to perform the other duties crowded upon him and look out for Mr. Lueders, and that even ten or fifteen seconds added to his time would have enabled him to save him.

We think that from the evidence the jury would have been justified in finding not only that the speed of the train was excessive in view of the ordinance, but that the fact contributed directly to his death in any or all of the three ways we have indicated.

Holding.

IV.  The question whether Mr. Lueders by his own negligence contributed directly to his death is simplified by the fact that it is specially **Contributory Negligence.** pleaded in the answer as follows: "That if plaintiff's husband was killed as alleged in the petition, the same was the result of his own carelessness, and neglect by going upon the railroad track of the defendant and walking thereon, when he knew, or by the exercise of ordinary care might have known, that the trains of the defendant were constantly passing thereon; and that after the train which it is alleged struck him was in view, he saw the same and could have stepped off of the track, and out of its way without injury, but he neglected and failed to do so, although he saw the said train, and in addition thereto, was warned of its approach."

As we have already seen, Mr. Lueders had the right, notwithstanding the municipal permission to the defendant to lay its track upon and move the trains along it, to use the street even where the defendant's track is laid, for purposes of ordinary travel, in a manner consistent with the right of defendant; and the defendant's right is measured by the permission by which it is created, and such lawful ordinances as may have been enacted defining and regulating its use, so that the deceased was under no obligation to anticipate that the defendant would use the street with its trains otherwise than to the extent of its said right, and might therefore presume, upon going upon the track, that it would conform its speed to the requirement of the ordinance.  Being so in the use of the track, the presumption would continue until he should become aware or have reason to believe that the defendant was violating or would violate the ordinance.  After he saw the train and had been warned of its approach, it was his duty to give it the right of way by making all reasonable efforts to get off the track so that it might pass without striking him.  Under this pleading we are not

called upon to consider to what extent the duty of watchfulness rested on him, for he actually saw the train, and the question is whether after he saw it he could, by the exercise of reasonable care, that is, by making a reasonable effort, considering all the circumstances, including his own condition and ability, have escaped it. The testimony of the engineer affords interesting and ample material for the enlightenment of the jury on that question. If they found that he could not have escaped by reasonable effort then it became their duty to inquire whether the train was exceeding the speed limit of file miles per hour. If they found that it was, it remained for them to determine whether, if it had been observing the speed limit from the time he first saw it, he could and would have escaped. These questions were all within the peculiar province of the jury, and there was no error in submitting them.

V. The defendant complains of the refusal of the court to give at its request the following instruction:

"6.  You are further instructed that although you may find from the evidence that the train which struck the deceased was running in excess of five miles an hour, yet, if you further find that the deceased was conscious of his danger in time to avoid the same, and he could have done so by stepping over the west rail and off the track, but instead of taking that course, he walked across the railroad track to the east, and undertook to leave the track on the east side, and in doing so he did not get off the same in time to avoid the train, then and in that case you will find the issues for the defendant."

*Instructions: Duty of One in Danger.*

It is sufficient to say of this instruction that the question is not what the deceased *could* have done to save himself in the light of all the facts and circumstances developed at the trial, but whether he acted as a reasonably careful man would have done in trying to escape it. The court committed no error in refusing it.

The judgment of the Cape Girardeau Court of Common Pleas is affirmed.

PER CURIAM—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All concur. *Graves, J.,* in separate opinion in which *Lamm, J.,* concurs. *Woodson, P. J.,* in separate opinion.

### SEPARATE CONCURRING OPINION.

GRAVES, J.—I concur in the result of the opinion by our learned commissioner, and in the opinion itself, except the following language:

"Since railways measure the distance from mile to mile by the number of telegraph poles, directing public attention to the system and its resulting information by painting upon the poles, and a nomenclature has come into general use in which 'telegraph poles' and 'car lengths' are used as units of distance, the courts may assume, without subjecting themselves to the imputation of arrogance, that a telegraph pole ordinarily represents a distance of as much as one hundred and fifty feet; so that, interpreting the statement of Mr. Carleton into the latter terms, it is safe to say that it means that the engineer whistled to alarm Mr. Lueders when he was yet three hundred feet away, and that he put the air on his brakes in emergency a hundred and fifty feet away."

This language is in effect announcing that we will take judicial notice of the fact that telegraph poles are not set less then 150 feet apart. This is a matter of proof and there is no proof in the record. We can't judicially know this fact, and as to the foregoing language I dissent. *Lamm, J.,* concurs in these views.